SUSAN M. CHEHARDY, Judge.
12Trevon Wiley appeals his convictions of second degree murder and aggravated burglary, and the resulting sentences. We affirm the convictions and sentences.
On March 6, 2008, Trevon Wiley and three co-defendants were indicted by the Jefferson Parish Grand Jury with one count of violation of La. R.S. 14:34.1, second degree murder, and one count of violation of La. R.S. 14:60, aggravated burglary.[1] The defendant’s case was severed for trial.[2] After a three-day trial, on August 19, 2009 a jury found the defendant guilty as charged.
On August 31, 2009 the trial court denied the defendant’s motion for new trial. That same day, the court pronounced sentence on the defendant. For the second degree murder conviction, the court imposed the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. For the aggravated burglary conviction, the court imposed a term of imprisonment for 30 years at hard labor, with the stipulation that 20 years of that sentence be served as “flat time.” The court ordered that both sentences run concurrently.
|sThis appeal ensued.
FACTS
Captain Dennis Thornton of the Jefferson Parish Sheriffs Office testified he was senior supervisor at the crime scene on July 18, 2007 at 2328 Sauvage Avenue in Marrero. He conducted the crime scene investigation, observing various items of evidence throughout the house and making a sketch of the scene. The victim, Louis Perreira, was already deceased when Thornton arrived at the crime scene. Thornton observed that the victim had a gunshot wound to the left side of his head. The victim was on a bed and appeared to have been shot where he was lying. Captain Thornton testified he made an evidence list from the scene of the crime, which included a piece of chewing gum pushed into the peephole on the front door. Thornton recovered the piece of gum immediately out of concern the gum would fall off the peephole, because he believed the gum had been freshly-chewed before *586 being affixed to the door. He wanted to recover DNA and/or fingerprint evidence from the gum. Thornton also recovered firearms from the scene and took numerous photographs, including pictures of the living room, the exterior of 2828 Sauvage, and the hallway heading to the back bedroom where the victim’s body was found.
Jason Barrette, a former Jefferson Parish Sheriffs Office deputy, testified he investigated this matter.[3] Barrette said that within a week of Louis Perreira’s death, Aaron Sennette and Christopher Sennette were arrested.[4] Rickey Taylor, Eric Brown, and Trevon Wiley (the defendant) were arrested several weeks later.
Barrette took a statement from Rickey Taylor, in which Taylor stated that Brown and the defendant took part in killing Louis Perreira. According to Taylor, |4while he was staying at the Sennette residence listening to music and using his computer, Trevon Wiley told him that he wanted to “jack” or rob somebody. Taylor then fell asleep. When Taylor woke up, he went outside to smoke a cigarette and noticed several police cars with their lights on outside the Perreira residence.[5] Taylor told Barrette that he later asked the defendant if he robbed and killed Louis Per-reira, to which the defendant replied ‘Tes.” Taylor said he learned from Brown that the defendant was the “triggerman,” that is, the person who actually killed the victim.
Barrette took a statement from Brown, in which Brown said that he was stationed as a lookout and that the defendant, Taylor, and Christopher Sennette broke into the Perreira residence through the front door. According to Brown, while he was stationed as a lookout he heard a pop and observed the defendant, Taylor, and Christopher Sennette run out of the Perreira residence. Barrette also took a statement from Ronnisha Johnson, who was the defendant’s girlfriend at the time.
Dr. Susan Garcia, accepted as an expert in forensic pathology, testified she performed an autopsy on Louis Perreira. Dr. Garcia testified that the victim sustained an intermediate-range gunshot wound from an approximate distance of one to three feet to the left side of his head, which was the cause of his death. Dr. Garcia said he had no other injuries to his body other than the entrance wound to his head.
Chad Pitfield of the Jefferson Parish Sheriff’s Office crime laboratory, an expert in latent fingerprint identification, testified he examined the piece of gum that was jammed into the front door’s peephole. Pitfield said he found a latent |fiprint on the piece of gum. He analyzed the latent print and concluded it was made by the right index finger of Trevon Wiley, the defendant.
Detective Arthur Thibodeaux of the Jefferson Parish Sheriffs Office testified he assisted Detective Barrette in a search for the murder weapon at 3136 Sweet Gum Drive in Harvey, the home of Ronnisha Johnson. Detectives Thibodeaux and Barrette proceeded to the location, where they spoke to Ronnisha Johnson’s father. He agreed to cooperate and allowed the detectives to search for a weapon. The search of the residence produced a .38 caliber *587 snub-nose revolver hidden inside a shoe in a closet. The revolver was a five-shot pistol, which had two bullets in the cylinder when Thibodeaux recovered it.
Mike Perreira, the victim’s son, testified that he learned of his father’s murder through a phone call from his mother. Mike arrived at the 2828 Sauvage residence shortly thereafter, but police would not permit him to enter the home right away. Later in the evening, police allowed Mike to enter the residence to see if anything was missing. He noticed that one of his father’s shotguns, his father’s cellular phone, and his father’s wallet were missing. Mike explained that Perreira had a prepaid cellular phone and that when he needed more prepaid minutes, he would purchase them from a convenience store operated by Joseph Cho.
Brenda Perreira, the victim’s wife, testified she had a dog that would bark if people entered her back yard. The night Louis Perreira was killed, Mrs. Perreira left for church a little after 7:00 p.m. According to Mrs. Perreira, her husband typically was ready for bed by 11:00 p.m. She testified that her husband would lock the doors after she left for church, would watch television in the living room for a while, then would turn out the house lights and retire to his bedroom to continue watching television.
lfiMrs. Perreira returned to her residence at approximately 11:30 p.m. As she arrived she noticed that the house lights were on and there were garbage bags on the front lawn, which she said were both unusual. Mrs. Perreira entered the residence and noticed that various possessions of her husband were strewn on the floor, including his guns, and his slippers were in the back hallway. She discovered her husband in the back bedroom on his side. She said he appeared to be dead. She called 911.
Mrs. Perreira confirmed that her husband would purchase cellular phone minutes from a convenience store operated by Joseph Cho. Sometime after her husband was killed, Mrs. Perreira went to Cho’s convenience store and informed Cho of what had occurred. Cho told her he could find out which numbers her husband’s cellular phone had dialed and which numbers had dialed the phone. Cho printed out the records, which Mrs. Perreira turned over to the police.
Hyoung “Joseph” Cho testified that he owns a cellular telephone store and Mr. Perreira was a frequent customer of prepaid phone cards. He explained that an international mobile equipment identity (IMEI) number is a unique serial number used to identify a particular cellular phone. He further explained that a SIM card is a device used to identify a particular cellular telephone subscriber and that it is possible for a subscriber to remove a SIM card from one phone and place the card in another phone. In that ease, any calls or downloads would still appear on the original subscriber’s phone records because the records reflect the use of the phone holding the SIM card.
Cho testified that prior to July 18, 2007, Perreira had not used his cellular phone since July 14, 2007. However, a phone containing the victim’s SIM card received an incoming call at 11:27 p.m. on July 18. That same phone purchased a ring tone, an answer tone, or a wallpaper for $1.99 several minutes later, made an ^outgoing call at 11:35 p.m., and purchased a ring tone for $2.49 at 11:36 p.m. At 11:50 p.m. that same phone made a call to a phone identified as belonging to Rickey Taylor.
Mike Haggerty, a security manager with AT & T Corp., verified these phone records.
*588 Rosalind Taylor testified that her son, co-defendant Rickey Taylor, was a friend of the defendant. Rosalind shared a prepaid cellular telephone with her son; however, her son was the primary user of the phone. She acknowledged that, according to the records prepared by Cho, the prepaid phone she shared with her son received several calls from a cellular phone containing Perreira’s SIM card in the days and weeks after Perreira’s death.
Anastasia Sennette testified that her son, co-defendant Christopher Sennette, was friends with the defendant. She identified the defendant and Christopher from several photographs posted to Christopher’s Myspace page.
Rose Brown testified that her son, co-defendant Eric Brown, knew the defendant from the neighborhood. She acknowledged that, according to the records prepared by Cho, her home phone received several calls from a cellular phone containing Louis Perreira’s SIM card in the days and weeks after the victim’s death.
Ronnisha Johnson testified that she was dating the defendant at the time of Louis Perreira’s death. She admitted she made and received approximately 20 calls to and from a cellular phone containing Louisa Perreira’s SIM card between July 18, 2007 and July 22, 2007. She recalled meeting with Barrette and making a statement to him about a .38 caliber revolver. In that statement, Ms. Johnson admitted to Barrette that the defendant placed the revolver in her house. She also admitted that she had seen the defendant with the gun.
| ^Sergeant Rodney Naumann of the Jefferson Parish Sheriff’s Office testified he took a buccal swab from the defendant.[6] According to Sergeant Naumann, each buccal swab taken by Jefferson Parish Sheriffs Office personnel is assigned a specific and distinct number. Sergeant Naumann also filled out a chain of custody form for the buccal swab.
Bonnie DuBourg of the Jefferson Parish Sherriffs Office, an expert in forensic DNA analysis, compared DNA taken from the chewing gum recovered from Per-reira’s peephole with that obtained from the defendant’s buccal swab. DuBourg was able to recover DNA from the chewing gum and she tested eight genetic markers on that DNA sample. The defendant’s DNA matched seven of the eight genetic markers on the DNA recovered from the chewing gum. According to Du-Bourg, only one in 58 million African-Americans would match seven of the eight markers. DuBourg testified it was not possible for the defendant’s DNA to be deposited on the chewing gum after the gum had been removed from the crime scene.
Emily Nick, manager of safety, security, and compliance for Myspace.com, testified that Myspace user number 96164447 was a male individual who identified himself as “Taylor.” “Taylor” listed his occupation as “getting money,” and the city where he was located as “OVG till I die.” Nick additionally testified that Myspace user number 153082201 identified himself as “Chris Sennette” of Marrero, Louisiana. Myspace user number 193092633 identified himself as “Smutty Baby” of Marrero, Louisiana.[7] “Taylor,” “Chris Sennette,” and “Smutty Baby” were all Myspace friends with each other.
[9We address Assignment of Error Number Two first, because it concerns *589 sufficiency of the evidence. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, a reviewing court must first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992).
ASSIGNMENT OF ERROR NUMBER TWO
The defendant challenges the sufficiency of the evidence used to convict him of second degree murder. More specifically, the defendant contends that the “evidence [used to convict him of second degree murder] was circumstantial and it did not mean that [the defendant] participated in the robbery and death of Perreira.”
The standard for reviewing sufficiency of the evidence on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
In the present case, the defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1. Second degree murder is defined as the killing of a human being when (1) the offender has a specific intent to kill or to inflict great bodily harm, or (2) when the offender is engaged in the perpetration or attempted perpetration of specific enumerated felonies, including aggravated burglary. La. R.S. 14:30.1(A). Thus, to prove second degree murder the State must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes.
|in“Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Determination of specific criminal intent is a question of fact for the trier of fact. State v. Huizar, 414 So.2d 741, 751 (La.1982).
Specific intent is a state of mind, and need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. State v. Graham, 420 So.2d 1126, 1127 (La.1982). Specific intent may be inferred from the circumstances and actions of the accused, as well as the extent and severity of the victim’s injuries. State v. Jackson, 03-883, p. 13 (La.App. 5 Cir. 4/27/04), 880 So.2d 841, 849-850, writ denied, 2004-1399 (La.11/8/04), 885 So.2d 1118.
“All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” La. R.S. 14:24. “Only those persons who knowingly participate in planning or execution of a crime are principals.” State v. Pierre, 93-893, p. 4 (La.2/3/94), 631 So.2d 427, 428. An individual may be convicted as a principal only for those crimes for which he personally has the requisite mental state. Id.
The mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. Id. However, “[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s | n intention.” State v. Anderson, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1225 (per curiam).
*590 There are several reported cases with facts similar to this case. In State v. Tolliver, 2008-1486 (La.App. 3 Cir. 5/13/09), 11 So.3d 584, writ denied, 2009-1441 (La.2/26/10), 28 So.3d 269, the defendant was convicted of rape and murder. There were no eyewitnesses to the crime, and the conviction was largely based upon fingerprint analysis and DNA test results. On appeal, the third circuit concluded:
The evidence presented at trial shows the defendant broke into [the victim’s] home and raped her. [The victim] was then, based on the presence of semen and concentration of the defendant’s spermatozoa in her mouth, smothered within minutes after the defendant completed the rape. In order to smother her, the perpetrator had to hold the pillow over her face from four to seven minutes. Nothing was reported missing from the home.
* * *
[T]he evidence ... shows the defendant committed a violent offense against [the victim] immediately before her death, so it was reasonable for the jurors to find the defendant was the person who committed the murder. Thus, there was sufficient evidence presented at trial to prove, beyond a reasonable doubt, that the defendant was guilty of the second degree murder of [the victim]. Accordingly, this assignment of error is without merit.
Id., 2008-1486 at pp. 20-21, 11 So.3d at 596-97.
In State v. McFarland, 07-26 (La.App. 5 Cir. 5/29/07), 960 So.2d 1142, writ denied, 2007-1463 (La.1/7/08), 973 So.2d 731, the defendant was charged with second degree murder and aggravated burglary along with four co-defendants. An eyewitness heard loud noises coming from the other side of his double shotgun house. The eyewitness looked out of his bedroom window and saw three black males trying to break through the victim’s front door. After a fourth man entered the other side of the shotgun double, the eyewitness heard a muffled yelling and | ^what he believed was a gunshot. When he looked outside of the front window, the eyewitness saw three black males running down the street. He called 911 to report what he had seen. Eventually, the defendant proceeded to trial before a 12-person jury, which found him guilty as charged.
On appeal, the defendant admitted breaking into the victim’s house, ostensibly to steal the victim’s cocaine. He contended that the evidence was insufficient to support his second degree murder conviction because the State failed to prove he had the intent to commit the underlying felony of aggravated burglary. The State contended it proved the defendant was guilty as a principal to felony murder when the victim was killed during the commission of an aggravated burglary.
In agreeing with the State, this Court pointed out, “The fact that the defendant claimed he did not know [one of his co-defendants] was armed does not absolve him from responsibility, as the risk that the unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary which every party to the offense must accept no matter what he or she actually intended.” McFarland, 07-26 at p. 10, 960 So.2d at 1148. We concluded, “After carefully reviewing the record and viewing the evidence in the light most favorable to the prosecution, we find the evidence was sufficient to support the defendant’s second degree murder conviction.” McFarland, 07-26 at p. 12, 960 So.2d at 1149.
In State v. Hill, 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 696-97, writ de *591 nied, 99-2848 (La.3/24/00), 758 So.2d 147, this Court upheld the defendant’s second degree murder conviction after the jury determined he was at least a principal to the crime. We concluded,
|1sIn any event, Hill was at the murder scene with knowledge by his own admission that McPherson planned to rob Reverend Smith and he (Hill) remained with McPherson. Hill said or did nothing to prevent the crime and he did not come to Reverend Smith’s aid after the shooting. Instead, he and McPherson fled. From this evidence, the jury found that Hill was at least a principal. We cannot say the Jackson v. Virginia standard was not satisfied. It is not the function of this Court to assess credibility or reweigh evidence.
Hill, 98-1087 at p. 10, 742 So.2d at 697.
In this case, arguably the most importance piece of evidence offered by the State was a piece of chewing gum. The officer who recovered the chewing gum testified it was fresh. The gum was placed over a peephole on the front door of the victim’s residence. A fingerprint analysis proved that the defendant’s fingerprint was on the piece of gum. A DNA analysis on the gum revealed that only one in 58 million African-American males would have the DNA profile for the DNA found on the gum. The defendant is an African-American male; DNA analysis could not exclude the defendant as the donor. The DNA results and the fingerprint analysis on the gum did not implicate any of the defendant’s co-defendants.
The State also offered the victim’s cellular phone records. The State proved that on the night of and in the days after the murder, an unknown person called the defendant’s girlfriend and two of the defendant’s three codefendants frequently from the victim’s cellular phone.
Where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, “assuming every fact to be proved that the evidence tends to prove.” State v. Frith, 08-52, p. 9 (La.App. 5 Cir. 4/29/08), 985 So.2d 792, 797, citing La. R.S. 15:438 and State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
h4We find that the evidence excludes every reasonable hypothesis of innocence and that the evidence used to convict the defendant of second degree murder was constitutionally sufficient. The defendant’s fingerprint and DNA were found at the scene of the crime. The victim's son testified that the victim’s cellular telephone was missing from the scene of the crime. The victim’s cellular telephone was used to call the defendant’s girlfriend and two of the defendant’s co-defendants repeatedly after the victim’s death. The State did not prove that the defendant fired the gun that killed the victim. As explained above, however, that was not necessary to convict the defendant of second degree murder. At the very least, the State proved beyond a reasonable doubt that the defendant was a principal to second degree murder. Accordingly, this assignment of error has no merit.
ASSIGNMENT OF ERROR NUMBER ONE
In this assignment, the defendant contends the trial court erred in refusing to allow him to question Jason Barrette about his felony drug arrests and to present evidence that Barrette had filed false police reports at hearings on a motion to suppress.
Barrette had previously been charged with filing false police reports and “doctor shopping.” At two hearings on the motion *592 to suppress, Barrette exercised his Fifth Amendment right not to testify when he was asked about the details of his arrest. At the conclusion of the second hearing, the trial court ruled that Barrette could testify at trial and that no mention of his arrests could be presented to the jury at trial. '
The defendant objected to this ruling and filed a writ application to contest it. This Court denied the application on May 28, 2009. See State v. Wiley, 09-262 (La.App. 5 Cir. 5/28/09) (unpublished writ disposition). The writ panel noted that the trial court’s decision was “fluid” and that Barrette was not promised anything in exchange for his testimony.
We find no merit to this assignment of error. The credibility of a witness may be attacked by any party, including the party calling him. La. C.E. art. 607(A). La. C.E. art. 609.1(B) provides that “[generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.”
Despite the general rule, the possibility that the prosecution may have leverage over a witness due to that witness’s pending criminal charges is recognized as a valid area of cross-examination. State v. Rankin, 465 So.2d 679, 681 (La.1985); State v. Brady, 381 So.2d 819, 822 (La.1980). It is well-settled that a witness’s “hope or knowledge that he will receive leniency from the state is highly relevant to establish bias or interest.” State v. Bowie, 2000-3344, p. 10 (La.4/3/02), 813 So.2d 377, 385, cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002), quoting State v. Vale, 95-1230, 95-0577 (La.1/26/96), 666 So.2d 1070. Moreover, a “witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding the conduct.” Vale, 95-1230 at 4, 666 So.2d at 1071.
The admissibility of evidence under La. C.E. art. 607(A) and La. C.E. art. 609.1(B) is subject to the balancing standard of La. C.E. art. 403, which states, “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.”
| |fiA trial judge’s determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Sandoval, 02-230, p. 11 (La.App. 5 Cir. 2/25/03), 841 So.2d 977, 985, writ denied, 03-853 (La.10/3/03), 855 So.2d 308.
In the present case, as noted by this Court in the earlier writ disposition, the record indicates that Barrette was not been promised anything in return for his testimony by the State. Nor is there any evidence that Barrette acted inappropriately in the case at bar, and his own arrest was remote from the arrest of the defendant. There is little probative evidentiary value to disclosing the nature of Barrette’s arrest. Accordingly, we find that the trial court did not abuse its discretion in ruling that Barrette could testify at trial and that no mention of his arrests could be presented to the jury at trial.
PATENT ERROR DISCUSSION
Pursuant to our usual procedure, we reviewed the record for errors patent. See La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, *593 556 So.2d 175 (La.App. 5 Cir.1990). We find two matters to be addressed.
First, the trial court sentenced the defendant to a term of imprisonment of 30 years at hard labor on the aggravated burglary conviction, with the stipulation that 20 years of that sentence was to be served as “flat time,” or without allowing the accumulation of good time. Under La. R.S. 15:571.3(A)(2), however, the sheriff of the parish where the conviction was obtained is authorized to determine when good time has been earned. The trial judge is not authorized to make that | ^determination.[8] Therefore, the district court must amend the commitment to delete the flat time restriction that the trial judge placed on the defendant’s sentence for aggravated burglary. See also, State v. Payne, 612 So.2d 153 (La.App. 5 Cir. 1992).
Second, the trial judge failed to observe the required 24-hour delay between the denial of the motion for new trial and the imposition of sentence, pursuant to La.C.Cr.P. art. 873. Absent a showing that prejudice resulted from the failure to afford the statutory delay, reversal of a prematurely imposed sentence is not necessary. State v. Jackson, 99-401, p. 11 (La.App. 5 Cir. 10/13/99), 746 So.2d 698, 704. In the present case, we And that the defendant was not prejudiced by the failure to observe the delay as it pertains to the second degree murder conviction and sentence, because the trial judge was required to impose a mandatory sentence of life imprisonment at hard labor. See, e.g., State v. Keating, 00-51 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 747, writ denied, 2000-3150 (La.10/12/01), 799 So.2d 494.
As to the aggravated burglary sentence, this Court generally has found that when a defendant challenges a non-mandatory sentence and the delay is not waived, his sentence must be vacated and the case remanded for re-sentencing. State v. Jones, 07-271, p. 10 (La.App. 5 Cir. 10/30/07), 970 So.2d 1143, 1149. On the other hand, this Court has determined that even when a defendant challenges a non-mandatory sentence and the delay is not waived, no remand is necessary when the error is harmless. Jones, 07-271 at p. 11, 970 So.2d at 1150. The defendant in this case has failed to show how he was prejudiced by the trial court’s error. Moreover, given that the defendant was sentenced to a term of life imprisonment at hard labor on the second | ^degree murder conviction, which we have affirmed, we consider any error on the aggravated burglary sentence harmless.
DECREE
For the foregoing reasons, the convictions and sentences are affirmed, but the matter is remanded and the district court is ordered to amend the commitment to delete the flat time restriction that the trial judge placed on the defendant’s sentence for aggravated burglary.

CONVICTIONS AND SENTENCES AFFIRMED; CASE REMANDED WITH INSTRUCTIONS

. The indictment also named Rickey Taylor, Christopher Sennette, and Eric Brown as perpetrators.

. The case has been prosecuted by the Louisiana Attorney General acting as District Attorney Ad Hoc.

. Barrette resigned from the Sheriff's Office after his arrest on drug charges. See discussion under Assignment of Error Number Two, below.

. The Sennettes are brothers. Aaron Sen-nette was later released.

.The Sennette residence is on Glaseo Drive, about half-a-block from the Perreira residence.

. A buccal swab (or buccal smear) is a medical procedure in which a small brush or cotton swab is used to collect a sample of cells and DNA from the inside surface of the cheek.

. Several witnesses testified that the defendant’s nickname is "Smut” or "Smutty.”

. The legislature has taken recent action regarding La. R.S. 15:571.3 that is inapplicable to this discussion. La. R.S. 15:571.3 was amended a bill in the 2010 Louisiana legislative session. The amendment is not relevant to this case.